Rafael Chavez C.D.C # V-37465
Salinas Valley State Prison
Fac. C.2 C. section # 224
P.O. Box 1050
Soledad Ca. 93960

United States Postal Service®

## DELIVERY CONFIRMATION™

0396 2400 0000 9955 5501



PRIORITY
MAIL

Northern District U.S. District
450 Golden Gate Avenue
San Francisco Ca. 94102



U.S. POSTAGE
PAID
GILROY, CA
95020
AUG 08 '08
AMOUNT
$5.45
0002602S-10

94102

MAIL ONLY

1050
Ca. 93960

United States Postal Service®
DELIVERY CONFIRMATION™

06 1400 0000 9955 5903

Label 107, February 2006

PRIORITY MAIL
UNITED STATES POSTAL SERVICE®
www.usps.com

Northern District U.S. District Court
450 Golden Gate Avenue
San Francisco  Ca. 94102

UNITED STATES
POSTAL SERVICE

0000

94102

AMOUNT
$5.45
0026025-10

1  Rafael E. Casas
   C2-224
2  Salinas Valley State Prison
   P. O. Box 1050
3  Soledad, Ca 93960-1050
   CDC # V-37465
4
   Petitioner In Pro Per
5

6

7                    UNITED STATES DISTRICT COURT

8                    NORTHERN DISTRICT OF CALIFORNIA

9  Rafael E. Casas,

10              Petitioner,

11  Vs.                              CV 08        3900

12

13  M. Evans, Warden,               (EVIDENTIARY HEARING REQUESTED)

14              Respondent.   /

15      BRIEF IN SUPPORT OF WRIT OF HEBEAS CORPUS .

16

17

18

19

20

21

22

23

24

25

26

27

28

FILED
AUG 14 2008
RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

1  Rafael E. Casas
   C2-224
2  Salinas Valley State Prison
   P. O. Box 1050
3  Soledad, Ca 93960-1050
   CDC # V-37465
4
   Petitioner In Pro Per:
5

6

7                          UNITED STATES DISTRICT COURT

8                        NORTHERN DISTRICT OF CALIFORNIA

9  Rafael E. Casas

10                                        CASE No.

11    Vs.                        PETITIONER'S EXHIBITS IN OF
                                 SUPPORT OF PETITION  FOR
12                               WRIT OF HABEAS CORPUS.

13 M. Evans, Warden,

14                  Respondent   /

15                      PETITIONER'S EXHIBITS IN SUPPORT OF
                          PETITION FOR WRIT OF HABEAS CORPUS
16
       PETITIONER RESPECTFULLY SUBMIT EXHIBITS (A-B)
17
   (A) SIXTH APPELLATE DISTRICT DENIAL FORM.  (COURT'S O PINION)
18
   (B) SUPREME COURT OF CALIFORNIA DENIAL FORM.
19

20

21

22

23

24

25

26

27

28

1  Rafael E. Casas
   C2-224
2  Salinas Valley State Prison
   P. O. Box 1050
3  Soledad, Ca 93960-1050
   CDC # V-37465
4
   Petitioner In Pro Per:
5

6

7                    UNITED STATES DISTRICT COURT

8                    NORTHERN DISTRICT OF CALIFORNIA

9  Rafael E. Casas

10                              REQUEST TO FILE BRIEF
                                IN SUPPORT OF WRIT OF
11    Vs.                       HEBEAS CORPUS.

12
   M. Evans, Warden,
13                Respondent   /

14

15

16

17

18      Petitioner  herein  respectfully  request  that  this  court  accept  this

19  brief for filling in support of this writ for habeas corpus served and filed

20  herewith.

21

22                                          Respectfully submitted,

23

24          Rafael casas

25                                              (Name)
                                        Petitioner, In pro per:
26

27

28

PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name  C Casas _____    Rafael _____    E _____
      (Last)                            (First)                   (Initial)

Prisoner Number  V 3 7 4 6 5 _____

Institutional Address  S. V. S. P. P. O. Box 1050 Soledad, Ca 93960 _____

=================================================================================

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

Rafael Espinoza Casas

_____
Full Name of Petitioner                    Case No.(To be provided by the
                                           clerk of court)

        vs.
M. Evans
                                           PETITION FOR A WRIT OF HABEAS CORPUS
_____
Name of Respondent
(Warden or jailor)

=================================================================================

### Read Comments Carefully Before Filling In

#### When and Where to File

    You should file in the Northern District if you were convicted and sentenced in one of these
counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San
Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this
district if you are challenging the manner in which your sentence is being executed, such as loss of good
time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

    If you are challenging your conviction or sentence and you were not convicted and sentenced in
one of the above-named fifteen counties, your petition will likely be transferred to the United States
District Court for the district in which the state court that convicted and sentenced you is located. If you
are challenging the execution of your sentence and you are not in prison in one of these counties, your

petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

<u>Who to Name as Respondent</u>

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack was entered.

## A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1.     What sentence are you challenging in this petition?

(a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

Superior Court                                    Santa Clara
_____        _____
        Court                                          Location

(b)    Case number, if known ___ FF511017 _____

(c)    Date and terms of sentence July 24, 2006 "15 yrs."

(d)    Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) Yes <u>X</u>  No __

Where? Salinas Valley State Prison P.O. Box 1050 Soledad, Ca 93960
_____
        (Name of Institution)                    (Address)

2.     For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

Pen. Code, Sec. 664, subd. (a)/sec. 187-count 1). Section 186.22, subd.(b)$_1$)(c$\phi$

§ 12022 subd. (b)(1)); §667.5 subd. (b)) 12022.7 subd. (a) 12022, subd. (b)(1)

Sec 1203, subd. (e)(3) Sec. 664, subd. (e) See Attachment (3)(a)

3.     Did you have any of the following?

Arraignment: Yes <u>X</u> No __   Preliminary Hearing: Yes <u>X</u> No __   Motion to Suppress: Yes <u>X</u> No __

3

Attachment (3)(a)


Sec 189
Sec. 192, subd. (a)
Sec. 21, subd. (a)
Sec. 186.22 subd. (b)(1)

4.   How did you plead?

Guilty _____   Not Guilty **X**   Nolo Contendere _____

Any other plea (specify) _____

5.   If you went to trial, what kind of trial did you have?

Jury _____   Judge alone **X**   Judge alone on a transcript _____

6.   Did you testify at your trial?   Yes **X**   No __

7.   Did you have an attorney at the following proceedings:

(a)   Arraignment   Yes **X**            No __
(b)   Preliminary hearing        Yes **X**        No __
(c)   Time of plea   Yes __            No __
(d)   Trial   Yes **X**      No __
(e)   Sentencing   Yes **X**      No __
(f)   Appeal       Yes **X**      No __
(g)   Other post-conviction proceeding   Yes **X**        No __

8.   Did you appeal your conviction?   Yes **X**   No __

(a)   If you did, to what court(s) did you appeal?

| | | | 2007 | affirmed |
|---|---|---|---|---|
| Court of Appeal | Yes **X** | No __ | (Year) | (Result) |
| Supreme Court of California | Yes **X** | No __ | 2007 (Year) | affirmed (Result) |
| Any other court | Yes __ | No **X** | (Year) | (Result) |

(b)   If you appealed, were the grounds the same as those that you are raising in this petition?                                    Yes **X**  No __

(c)   Was there an opinion?        Yes **X**  No __

(d)   Did you seek permission to file a late appeal under Rule 31(a)?
Yes __        No __   **N/A**

4

If you did, give the name of the court and the result:

9.    Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?    Yes __    No __**X**

Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. § 2244(b).

      (a)    If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I.    Name of Court **THE SUPREME COURT OF THE STATE OF CALIFORNIA**

    Type of Proceeding **PETITION FOR REVIEW**

    Grounds raised (Be brief but specific):

    a.    **SEE ATTACHMENT (6)(a), (b), and (c)**

    b.

    c.

    d.

    Result **Affirmed**     Date of Result **11-14-07**

II.    Name of Court

    Type of Proceeding

    Grounds raised (Be brief but specific):

    a.

    b.

    c.

    d.

    Result     Date of Result

III.    Name of Court

Attachment (6)(a), (b), and (c).

(I) (a) THE TRIAL COURT DENIED PETITIONER HIS FEDERAL CONSTITUTIONAL RIGHTS TO A FUNDAMENTALLY FAIL TRIAL AND DUE PROCESS BY FINDING PETITIONER COMMITTED ATTEMPTED SECOND DEGREE MURDER WITHOUT PROOF BEYOND A REASONABLE DOUBT THAT HE HAD SPECIFIC INTENT TO KILL.

(II) (b) PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO ASSERT THE MITIGATING EVIDENCE OF SUDDEN-QUARREL AND/OR HEAT OF PASSION AND OBJECT TO THE ABSENCE OF EVIDENCE OF SPECIFIC INTENT TO KILL.

(III) (c) THE TRIAL COURT DENIED PETITIONER HIS FEDERAL CONSTITUTIONAL RIGHTS TO A FUNDAMENTALLY FAIR TRIAL AND DUE PROCESS BY FINDING PETITIONER COMMITTED THE CHARGED OFFENSE FOR THE BENEFIT OF A CRIMINAL STREET GANG WITHOUT PROOF BEYOND A REASONABLE DOUBT THAT HE HAD SPECIFIC INTENT TO BENEFIT THE GANG.

Type of Proceeding _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result _____ Date of Result _____

    (b)   Is any petition, appeal or other post-conviction proceeding now pending in any

court?    Yes __ No **X**

_____

(Name and location of court)

## B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you need more space. Answer the same questions for each claim.

Note: You must present ALL your claims in your first federal habeas petition. Subsequent petitions may be dismissed without review on the merits. 28 U.S.C. § 2244(b); McCleskey v. Zant, 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

**SEE ATTACHMENT Pages 1-6.**
Claim One: _____

7

I.

1  THE TRIAL COURT DENIED PETITIONER HIS FEDERAL CONSTITUTIONAL RIGHTS

2  TO A FUNDAMENTALLY FAIR TRIAL AND DUE PROCESS BY FINDING PETITIONER

3  COMMITTED ATTEMPTED SECOND DEGREE MURDER WITH OUT PROOF BEYOND A

   REASONABLE DOUBT THAT HE HAD SPECIFIC INTENT TO KILL.

4

5       Due process under the Fifth and Fourteenth Amendments "prohibits the

6  criminal conviction of any person except on proof beyond a reasonable

7  doubt." To be consistent with due process, however, the appellate court

8  must determine whether any rational trier of fact could have found the

9  essential elements of the crime beyond a reasonable doubt, viewing the

10  record as a whole.

11      The sustaining of a verdict unsupported by substantial evidence

12  relieves the prosecutor of the burden of proving every element of the

13  offense beyond a reasonable doubt, by lowering the threshold of proof below

14  that required by the Fifth and Fourteenth Amendment's right to due process.

15          A.   Attempted Murder and Attempted Voluntary Manslaughter.

16      The crime of attempt requires "a specific intent to commit the crime"

17  and "a direct ineffectual act done toward its commission." The crime of

18  attempted murder requires a specific intent to kill together with a direct

19  act towards that end. Murder, either first or second degree, the unlawful

20  killing (i.e., a killing which is not justifiable or excusable) of a human

21  being, requires proof of malice. Malice may be express (intent to kill)

22  or implied (intentional act dangerous to life done with conscious disregard

23  of risk to life). Since only express malice equates with specific intent

24  to kill, attempted murder requires that express malice be shown.

25      As the Saille court point out, though the Legislature's amendment

26  to section 188 in 1981 had the effect of equating express malice with a

27  deliberate intention unlawfully to kill, the Legislature intended to permit

28  negation of malice even where there is an unlawful intent to kill.

1.

1   Accordingly, malice may be negated upon a "sudden quarrel," "heat of
2   passion," or an honest but unreasonable belief in the need to defend against
3   imminent peril of life or great bodily injury to oneself or another. "An
4   intentional unlawful homicide is upon 'a sudden quarrel or heat of passion,'
5   and thus voluntary manslaughter, if the killer's reason actually was
6   obscured as a result of a strong passion aroused by a "provocation"
7   sufficient to cause an... '"' ordinary [person] of average disposition'""
8   to act rashly and without due deliberation and reflection, and from this
9   passion rather than judgment." This statement of the rule identifies the
10  objective aspect of the test, which pertains to the provocation element.
11  However, the test is subjective insofar as the defendant must in fact have
12  been acting within the clouded judgment of a sudden quarrel or upon the
13  heat of passion. Described in this fashion, it is clear that the subjective
14  and objective aspects are closely intertwined. While the statute speaks
15  expressly in terms of sudden quarrel and heat of passion as disjunctive
16  tests, the case law has tended not to distinguish the two. Factually, the
17  focus of the cases has been on the heat-of-passion test. Valentine is the
18  only case petitioner can identify where "sudden quarrel" was argued to
19  be distinct from "heat of passion." There the court followed the rule that
20  provocation is required in either instance, but that mere words (i.e.,
21  a quarrel without more) are insufficient). Words alone could provoke a
22  heat of passion, though the words did not arise out of a sudden quarrel.
23  Whenever the evidence raises a question concerning the issue of sudden
24  quarrel or heat of passion, the burden is on the prosecution to prove the
25  absence of such. The defendant need only show some credible evidence raising
26  a reasonable doubt about sudden quarrel/heat of passion in order to be
27  entitled to instructions on manslaughter (i. e., evidence "from which
28  reasonable persons could have concluded there was sufficient provocation

1     to reduce murder to manslaughter." As with the crime of murder itself,

2     malice can be negated in attempted murder by sudden quarrel and/or heat

3     of passion such that the crime must be reduced to attempted voluntary

4     manslaughter. A defendant charged with attempted murder is always permitted

5     to defend on the ground that he did not in fact form an inten to unlawfully

6     kill, for example, when there is evidence of intoxication or mental illness.

7     To the extent that the evidence of specific intent to kill is lacking in

8     the first instance, the evidence is only sufficient to support a finding

9     of a lesser included offense of assault with a deadly weapon.

10          B.   The Prosecution Failed to Carry its Burden of Proof

11               that Intent To Kill Was Not Negated by a Sudden Quarrel

12          or Heat of Passion and/or that Specific Intent To Kill Was Present.

13          In this case, defense counsel did not argue absence of intent to kill

14    based on sudden quarrel/heat of passion. Rather he argued the theories

15    of self-defense and imperfect self-defense. (RT 323-325.) In announcing

16    its decision, the trial court only addressed mitigating evidence as to

17    intent in terms of the self-defense/imperfect self-defense theory. (RT

18    406-408.) The court asserted that petitioner did not subjectively believe

19    he was in imminent danger of being killed or suffering great bodily injury

20    and therefore rejected the proffered defense. (RT 407-408.) Its rationale

21    rested in part on the fact that petitioner was the primary aggressor who,

22    initiated the chain of events that led to ultimately the stabbing of Mr.

23    Sablan." (RT. 407, also see RT 408.) Acknowledging that the trial court

24    did not expressly find that petitioner's was not because of a sudden quarrel

25    or in the heat of passion, the Court of Appeal reasoned that this was

26    immaterial because in rejecting the imperfect self-dense theory, it

27    necessarily found petitioner was "not provoked and/or that any provocation

28    was not sufficient to have caused a person of average disposition to act

3.

1  rashly and without due deliberation. (Court opn., pp. 11-12.) The two test
2  are not identical, nor even functionally equivalent. The appreciation of
3  a threat of great bodily injury or death invokes an entirely different
4  mental process than the emotional turmoil that is the impetus for heat
5  of passion. Passion clouds judgment; fear invokes the impulse to defend
6  oneself with deadly force. Thus, the appellate court's rationale is without
7  value or significance in the analysis. More to the point, the Court of
8  Appeal's summation of the relevant evidence- and indeed its initial
9  statement of the facts of the case- completely omit the evidence upon which
10 petitioner would have relied upon if counsel had argued the proper defense.
11 Petitioner had a surprise encounter with his live-in girlfriend at 11:30
12 p.m. on a Saturday night at a gas station bathroom, after she had been
13 partying out of town that night with her girlfriend. (RT 109-110, 113.)
14 Valasquez knew petitioner was jealous and upset with her. (RT 135.) An
15 argument ensued after petitioner demanded that Valasquez return home and
16 she refused. (RT 135-136.) Valasquez's girlfriend took her side and was
17 attempting to extricate Valasquez from the situation. (RT 136.) That
18 Valasquez and her girlfriend would refuse to cooperate with petitioner
19 would have been mortifying to any reasonable person given the public nature
20 of the dispute. At the precise moment this was happening, Sablan got out
21 of the car and began running toward petitioner. (RT 16, 184, 188, 203-204.)
22 Sablan does not understand Spanish and did not understand what petitioner
23 was saying to his girlfriend. (RT 18.) Sablan told petitioner to "chill
24 out," at which point petitioner turned toward him, told him to mind his
25 own business, and warned Sablan he was "fucking with the wrong Norteno."
26 (RT 20, 184.) When Sablan, a karate expert, saw petitioner coming toward
27 him with a clenched fish, he delivered a preemptive first punch to
28 petitioner's face, dropping petitioner to the ground. (RT 20-21, 52.)

4.

1  Petitioner fell and was stunned, saying "What the fuck, like what's
2  happening?" (RT 310.) In this startled condition, petitioner got up from
3  the ground, trying to summon his will to respond, and stated he would kill
4  Sablan. (RT 21-22.) Even Sablan did not interpret this in the literal sense,
5  only that petitioner intended to do physical harm to him. (RT 55.) The
6  element of provocation is satisfied because petitioner was already
7  frustrated and angry about his girlfriend's infidelity, which was than
8  exacerbated by Sablan's sudden and physical intervention. At the time Sablan
9  threw the first punch, petitioner had demonstrated on intent to kill. His
10 statement that he would kill Sablan occurred as he got up to resume the
11 fight. Petitioner's response qualifies as a "violent, intense, high-wrought
12 or enthusiastic emotion" within the meaning of sudden quarrel/heat of
13 passion upon adequate provocation. The evidence, not simply that offered
14 by the defense, was clearly sufficient to raise a reasonable doubt about
15 sudden quarrel/heat of passion. Even assuming for purposes of argument
16 the trial court could have found beyond a reasonable doubt that petitioner
17 triggered the chain of events leading to the stabbing, the use of deadly
18 force in a sudden quarrel or heat of passion is not murder even if an intent
19 to kill exists.

20     The "[v]iolent, intense, high-wrought...emotion" which characterized
21 petitioner's response here sufficiently establishes that the prosecution
22 failed to meet its burden of proving the absence of sudden quarrel/heat
23 of passion. If a reasonable person in petitioner's circumstances would
24 reasonably be inflamed to further passion by the intervention of a total
25 stranger, rushing up as if to intervene physically, then mitigation must
26 be recognized under the circumstance of this case. The fact that petitioner
27 sought a tactical advantage by arming himself also does not defeat his
28 claim of sudden quarrel/heat of passion. The threshold, and indeed the

1  only issue, given the defense at issue here. is whether the intent to kill
2  was formed in the heat of passion or upon a sudden quarrel when judgment
3  of a reasonable person would have been suspended. Regardless of whether
4  sudden-quarrel/heat-of passion negated express malice, there is insufficient
5  evidence to prove beyond a reasonable doubt that petitioner had the specific
6  intent to kill sablan. In the case of attempted murder, the prosecution
7  has the burden of showing a specific intent to commit a murder, not simply
8  a callous heart striking out in anger knowing of life-endangering
9  consequences (implied malice). It cannot be denied that the words "I'm
10 going to kill you," are used so routinely, in street fights, sporting
11 contests, and even playground or video-game contests, as to have been
12 greatly debased in today's society, such that they are rarely indicative
13 of actual intent to take life. Sablan did not interpret petitioner's words
14 as such a statement of intention. (RT 55.) Petitioner used his knife in
15 a reflexive fashion after recognizing, based on Sablan's skill and his
16 own weakened physical state, that he was over-matched. (RT 21, 52, 189-
17 191, 260-261.) Sablan was emboldened by alcohol. (RT 60-62.) Rodriquez
18 denied that petitioner started the fight because Sablan rushed up to
19 petitioner and immediately "nailed" him with the first punch. (RT 188-191.)
20 The knife was a small-folding knife with a one-and-one-half inch blade,
21 and, even when petitioner armed himself, it could not be seen by Sablan
22 and Rodriquez. (RT 22, 134-135, 192-193.) None of the wounds were life-
23 threatening. (RT 26-31, 77.) Petitioner immediately fled the scene when
24 Valdibia drove up in the truck. (RT 23-24.) Accordingly, petitioner was
25 denied due process on the basis of an attempted murder conviction not
26 supported by evidence sufficient to meet the constitutionally mandated
27 beyond-a-reasonable doubt standard.

28

6.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

II

PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL
BY COUNSEL'S FAILURE TO ASSERT THE MITIGATING EVIDENCE
OF SUDDEN-QUARREL AND/OR HEAT OF PASSION AND OBJECT TO
THE ABSENCE OF EVIDENCE OF SPECIFIC INTENT TO KILL.

As noted above, other than self-defense and imperfect self-defense, the trial court considered no other theories on which to reduce the offense from attempted murder. Defense counsel's failure to raise a potentially meritorious defense based on sudden quarrel/heat of passion and lack of specific intent to kill denied petitioner his federal constitutional rights to effective assistance of counsel and due process of law.

A.   Counsel Failed To Render Competent Representation.

Under the federal constitution, an accused is entitled to the right to assistance of counsel. This right entitles the defendant to "effective" assistance in the proceedings. When a claim of denial of effective assistance of counsel is made, the petitioner must show that (1) trial counsel failed to act in the manner to be expected of a reasonably competent attorney acting as a diligent advocate for his client, and (2) it is reasonably probable that a more favorable outcome would have resulted in the absence of counsel's failing. Counsel has a duty to investigate and raise all available defenses suggested by a review of the evidence and adequate investigation. [Failure to develop evidence as to question of diminished capacity]. This duty includes "careful preparation of and request for all instructions which in his judgment is necessary to explain all of the legal theories upon which his defense rests." Failure to present a potentially meritorious defense amounts to the withdrawal of effective representation on a critical issue, which failure reduces the trial to a farce or sham.

B.   Counsel's Omissions Were Prejudicial.

7.

1    The Court of Appeal rejected petitioner's ineffective-assistance-of
2  counsel claim based on its conclusion that the trial court impliedly
3  rejected the sudden-quarrel/heat-of-passion defense by finding no basis
4  for the self-defense/imperfect-self-defense theory. (Court opn., pp. 13-
5  14.) The Court of Appeal also suggested that the trial court was aware
6  of the attempted voluntary manslaughter theory based on the prosecutor's
7  brief argument that heat-of-passion was not involved. (Court opn. p. 13.)
8  The decision thus rest not on the issue of counsel's trial conduct, but
9  whether such conduct was prejudicial. The Court of Appeal concludes that
10  it was not. (Court opn., p. 14.) The United States Supreme Court explained
11  that the ineffective-assistance-of-counsel claim arises from the Sixth
12  Amendment and that the purpose of the right to effective assistance of
13  counsel is "to ensure that criminal defendants receive a fair trial." Under
14  the standard adopted by the Strickland court, "a defendant need not show
15  that counsel's deficient conduct more likely than not altered the outcome
16  in the case." The Strickland case was a capital murder case in which it
17  had been found that counsel failed to investigate mitigating evidence in
18  preparation for the sentencing proceedings. Accordingly, in explicating
19  the standard of reversal, the court articulated a set of factors pertinent
20  to the type of case where counsel fails to introduce exculpatory evidence.
21  [distinguishing standard for omission of newly discovered evidence, and
22  explaining that the inquiry is essentially objective].) In doing so the
23  court stated that "[i]n making the determination whether the specified
24  errors resulted in the required prejudice, a court should presume, absent
25  challenge to the judgment on grounds of evidentiary insufficiency, that
26  the judge or jury acted according to law" Stated differently, in applying
27  the Strickland prejudice factors it is to be assumed that the issues in
28  the case were properly framed and that counsel's omission had no material

8.

1   bearing on whether the prosecution was successful in meeting its burden
2   of proof.

3       Because there was sufficient evidence to require that the trial court
4   assess the sudden-quarrel/heat-of-passion defense, it failed to do so,
5   and the prosecution bore the burden of proving the absence of provocation,
6   the trial was fundamentally unfair to petitioner, as a result of counsel's
7   omission. And even where provocation is not legally adequate, reasonable
8   doubt may be raised by the underlying circumstances as to whether the
9   defendant in fact formed a specific intent to kill, an argument advanced
10  by petitioner here. The request for consideration of lesser included
11  offenses constitute a procedure "necessary to ensure reliability in the
12  fact-finding process." On this record, there can be no plausible argument
13  that the attempted voluntary manslaughter or lack of specific intent
14  theories were entertained by the trial court. As explained above, the self-
15  defense mental state is devoid of any inquiry into judgment clouded by
16  passion. This presents an even stronger argument for prejudicial error
17  because whatever predicted outcome may be inferred from the record had
18  the defense actually been considered is irrelevant. Under the proper
19  objective test, the reviewing court is not to be concerned with the
20  predilections of the particular judge who presided over the case nor the
21  "actual process of decision." The reviewing is to stand in the the shoes
22  of decision-maker that "is reasonably, conscientiously, and impartially
23  applying the standards that govern the decision."

24      Accordingly, petitioner was denied due process and effective assistance
25  of counsel based on counsel failing to argue sudden-quarrel/heat of passion
26  lack of specific intent to kill.

27
28

9.

III.

THE TRIAL COURT DENIED PETITIONER HIS FEDERAL
CONSTITUTIONAL RIGHTS TO A FUNDAMENTALLY FAIR TRIAL AND
DUE PROCESS BY FINDING PETITIONER COMMITTED THE CHARGED
OFFENSE FOR THE BENEFIT OF A CRIMINAL STREET GANG WITHOUT
PROOF BEYOND A REASONABLE DOUBT THAT HE HAD SPECIFIC INTENT
TO BENEFIT THE GANG.

Due process under the Fifth and Fourteenth Amendments "prohibits the criminal conviction of any person except on proof beyond a reasonable doubt."

To be consistent with due process, however, the appellate court must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, viewing the record as a whole. The sustaining of a verdict unsupported by substantial evidence relieves the prosecutor of the burden of proving every element of the offense beyond a reasonable doubt, by lowering the threshold of proof below that required by the Fifth and Fourteenth Amendment's right to due process. Here the evidence was insufficient to show that in stabbing Sablan petitioner had the specific intent to commit the crime for the benefit of the Norteno gang. The Court of Appeal found that the evidence was sufficient to meet the prosecution's burden of proof based on Officer Flippo's opinion that the crime enhanced the reputation of the gang (since it was committed by a known member). But nowhere does the Court of Appeal explain the basis upon which the officer's opinion establishes petitioner's specific intent that his criminal action was intended to benefit the gang.

The language of the statute is clear by its own terms that specific intent must be proved by the prosecution in order to prove the enhancement. "A specific intent is an intent to accomplish some additional consequence by commission of the proscribed act." Thus, as distinguished from a general intent crime, it is not enough that the defendant intends to

10.

1  perform the act that constitutes the offense; he must intent some specific
2  harm to result from his act.

3      Officer Flippo's testimony does not suffice to establish that
4  petitioner's assault was with the specific intent to benefit his gang.
5  Petitioner does not necessarily take issue with Flippo's contention that
6  a crime committed by a gang member who announces his gang affiliation
7  in the course of committing the crime in some sense, however, attenuated
8  or direct, benefits the gang to which the offender belongs. However, this
9  does not establish that petitioner or any gang member who seeks to enhance
10  his reputation, or the gang's reputation, by demonstrating his bravado
11  in a street fight specifically intends for it to advance any particular
12  criminal conduct by the gang as opposed to other possible purposes. Such
13  non-gang-benefiting purposed may be non-criminal gang activities or
14  personal. In this case the Court of Appeal's analysis simply ceases once
15  it concludes that the trier of fact could rely upon and accept Flippo's
16  testimony that the crime benefited the gang. (Court opn., pp. 16-17.)
17  Nothing in Flippo's testimony clearly establishes that petitioner's intent
18  (specifically) was to advance gang criminal conduct as opposed to his
19  own personal grudge against Sablan. Similar to the failing of the Court
20  of Appeal here, prior reported decisions have failed to make this
21  distinction between the expert's testimony that the crime benefited the
22  gang as opposed to the ultimate fact determination that the defendant
23  committed the crime with the specific intent to benefit the gang (and
24  its criminal conduct). One case does however, cited by the appellate court
25  here, affirmatively acknowledges the circumstances that may demonstrate
26  that a crime benefits the gang but does not demonstrate that the defendant
27  intended to commit the crime for that purpose.

28      Here the evidence supports no more than the fact that petitioner

11.

1   attacked Sablan to advance his personal cause in relation to his conflict
2   with Valasquez. Petitioner could have had no animosity toward Sablan
3   because of Salan's gang affiliation, since there was no evidence that
4   Sablan was associated with a gang. Any inference that petitioner had formed
5   the specific intent to advance some cause of the Norteno gang dissipates
6   when it is recognized that his invocation of Norteno affiliation arose
7   in the heat of the moment, after being felled by a punch of more accurate
8   and quicker opponent.

9       Accordingly, petitioner was denied due process on the basis of a
10  gang enhancement finding not supported by evidence sufficient to meet
11  the constitutionally mandated beyond a reasonable doubt standard.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                              12.

Supporting Facts:   SEE ATTACHMENT Pages 1-6

Claim Two:   SEE ATTACHMENT Pages 7-9

Supporting Facts:   SEE ATTACHMENTS PAGES 7-9

Claim Three:   SEE ATTACHMENTS PAGES 10-12

Supporting Facts:   SEE ATTACHMENTS PAGES 10-12

If any of these grounds was not previously presented to any other court, state briefly which

grounds were not presented and why:

N/A

8

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

**See Attachment 9(a) (b)**

Do you have an attorney for this petition?    Yes ___  No☒___

If you do, give the name and address of your attorney:

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on _7·8 - 2008_   _____
　　　　　　　Date　　　　　　　　　Signature of Petitioner

( rev. 5/96)

9

Attachment 9(a)

Chapman v. California (1967) 386 U. S. 18.

Garcia v. Carey (9th Cir. 2005) 395 F.3d 1099.

In re Winship (1970) 397 U. S. 358.

Neder v. United States (1999) 527 U. S. 1.

People v. Atkins (2001) 25 Cal. 4th 76.

People v. Berry (1976) 18 Cal. 3d 509.

People v. Blakeley (2000) 23 Cal. 4th 82.

People v. Bloyd (1987) 43 Cal. 3d 333.

People v Breverman (1998) 19 Cal. 4th 142.

People v. Collins (1961) 189 Cal. App. 2d 575.

People v. Dillon (1983) 34 Cal. 3d 441.

People v. Douglas (1990) 220 Cal. App. 3d 544.

Peopel v. Flannel (1979) 25 Cal. 3d 668.

People v. Floyd (1970) 1 Cal. 3d 694

People v. Frierson (1979) 25 Cal. 3d 142.

People v. Geiger (1984) 35 Cal. 3d 510.

People v. Guerra (1985) 40 Cal. 3d 377.

People v. Johnson (1992) 5 Cal. App. 4th 552.

People v. Lasko (2000) 23 Cal. 4th 101.

People v. Ledesma (1987) 43 Cal. 3d 171.

People v. Lee (1987) 43 Cal. 3d 666.

People v. Lee (1999) 20 Cal. 4th 47.

People v. Logan (1917) 175 Cal. 45.

People v. Lyons (1991) 235 Cal. App. 3d 1456.

People v. Martinez (1980) 105 Cal. App. 3d 938.

People v. Morales (2003) 112 Cal. App. 4th 1176.

People v. Nieto-Benitez (1992) 4 Cal. 4th 91.

People v. Olguin (1994) 31 Cal. App. 4th 1355.

People v. Rois (2000) 23 Cal. 4th 450.

People v. Romero (2006) 140 Cal. App. 4th 15.

People v. Saille (1991) 54 Cal. 3d 1103.

People v. Sedeno (1974) 10 Cal. 3d. 703

People v. Spurlin (1984) 136 Cal. App. 3d 119.

People v. Toledo (1948) 85 Cal. App. 2d 577.

People v. Valentine (1946) 28 Cal. 2d 121.

People v. Van Ronk (1985) 171 Cal. App. 3d 818.

People v. Wharton (1991) 53 Cal. 3d 522.

People v. Wickersham (1982) 32 Cal. 3d 307.

People v. Williams (1980) 102 Cal. App. 3d 1018.

Powell v. Alabama (1932) 287 U. S. 45.

Strickland v. Washington (1984) 466 U. S. 668.

Sullivan v. Louisiana (1993) 508 U. S. 275.

Ulster County Court v. Allen (1979) 442 U. S. 140.

United States v. Bishop (9th Cir. 1992) 959 F.2d 820.

Exhibit

A

**COPY**

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

Court of Appeal - Sixth App. Dist.

SIXTH APPELLATE DISTRICT

AUG 2 - 2007

MICHAEL J. YERLY, Clerk

By _____
DEPUTY

| | |
|---|---|
| THE PEOPLE, | H030514 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. FF511017) |
| v. | |
| RAFAEL ESPINOZA CASAS, | |
| Defendant and Appellant. | |

Defendant Rafael Casas was convicted after court trial of attempted second degree murder (Pen. Code, §§ 664, subd. (a), 187).[1] The court further found that defendant personally used a deadly or dangerous weapon in the commission of the offense (§ 12022, subd. (b)(1)); that he committed the offense for the benefit of, or in association with, a criminal street gang (§ 186.22, subd. (b)(1)(C)); and that he had served a prior prison term (§ 667.5, subd. (b)). Defendant was sentenced to 15 years in state prison.

On appeal, defendant contends that: (1) there is insufficient evidence to support the conviction; (2) he was denied effective assistance of counsel; and (3) there is insufficient evidence to support the finding that he committed the offense for the benefit

---

[1] Further statutory references are to the Penal Code unless otherwise specified.

of, or in association with, a criminal street gang. We disagree with these contentions and, therefore, affirm the judgment.

## BACKGROUND

Defendant was charged by information with attempted premeditated murder (§§ 664, subd. (a), 187, 189; count 1), and possession of methamphetamine for sale (Health & Saf. Code, § 11378; count 2). The information further alleged that defendant personally used a deadly and dangerous weapon, a knife, during the commission of the offense in count 1 (§ 12022, subd. (b)(1)); that he personally inflicted great bodily injury on the victim (§§ 12022.7, subd. (a), 1203, subd. (e)(3)); and that he committed the offense for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)). In addition, the information alleged that defendant had served a prior prison term. (§ 667.5, subd. (b)). Defendant waived his right to a jury trial and the prosecutor struck the allegation of premeditation in count 1. The prosecutor dismissed count 2 at the close of the prosecution's case.

### *The Prosecution's Case*[2]

#### The Events of May 7, 2005

On May 7, 2005, defendant went to San Jose to install a stereo system in a black truck owned by Francisco Valdibia. When he was done, Valdibia drove defendant back to Gilroy. They stopped at a Rotten Robbie gas station there, where defendant saw his girlfriend Bianca Valasquez. Defendant went to talk to Valasquez while Valdibia put gas in his truck. Defendant appeared to Valdibia to be upset at Valasquez and was yelling at her. As Valdibia was leaving, he saw defendant being chased by two people. Valdibia stopped and defendant jumped in the truck. He yelled at Valasquez to get into the truck with him. Valdibia asked defendant what was happening. Defendant said that he was

---

[2] As the prosecutor dismissed count 2, we do not set forth the evidence presented in support of that count.

2

just fighting with his girlfriend, and he told Valdibia to just drive him home. Valdibia did so and then went home himself. He did not see defendant with a knife.

Valasquez[3] first met defendant in 2003. Defendant liked to wear red, and Valasquez knew that he was a Norteño gang member. By May 7, 2005, defendant and Valasquez had been living together for about five months. Around 11:30 p.m. that night, Valasquez was at the gas station with her friend Angelica in order to use the restroom. She saw defendant drive up in a black truck with somebody she did not recognize. Defendant saw Valasquez and asked her what she was doing there. He demanded that she go home with him and she refused. Defendant grabbed her by the arm and hair and yelled at her. Angelica yelled at defendant to let Valasquez go. Valasquez saw a man get out of a car, approach them, and ask her if she was all right. The man then hit defendant, causing him to fall to the ground. When defendant got up, Valasquez saw that he had a knife. The two men started fighting, but Valasquez did not see defendant stab the man. Defendant ran from the man back to the black truck, and the man and two women followed him. Defendant left in the truck before the others reached him. Defendant later told Valasquez that he hid the knife and told her to not say anything if asked about the incident.

Close to midnight on May 7, 2005, John Sablan,[4] his cousin Kristalyn Rodriguez, and her friend Erika were parked near the restrooms at the gas station. Rodriguez and Erika were in the front seat of Rodriquez's car, and Sablan was asleep in the back seat. They had all been drinking and Sablan was tired. Rodriguez woke Sablan up and asked him to help some woman. Sablan saw defendant, who was about 20 feet away and who

---

[3] Valasquez testified that she was convicted of two counts of felony burglary in 1998.

[4] Sablan testified that he was convicted in 2003 of battery on a peace officer (§ 243, subd. (b)), and possession of a firearm (§ 12021, subd. (c)).

3

was wearing a red T-shirt and black jeans, pull one woman's hair while another woman tried to grab him off her. Sablan approached defendant and the two women. The two women were yelling at defendant in Spanish; they appeared to Sablan to be afraid and to want defendant to stop.

Sablan asked the women if they were all right or if they needed help. Defendant told Sablan to mind his own business and said, "You're fucking with the wrong Norteño." Defendant then ran at Sablan with his hands in a fist. Sablan understood that defendant was using a gang term and thought that defendant was going to hit him; he did not see a knife. He stood his ground and hit defendant in the face with his fist. Defendant fell to the ground, but got back up and said, "I'm going to kill you." Defendant and Sablan then began fighting.

After a few minutes, a black truck pulled up and defendant ran to it and got in the passenger side. Sablan and Rodriquez chased defendant, but the truck drove off. Rodriguez asked Sablan if he had been hurt. Sablan lifted up his shirt and they saw a lot of blood. Rodriguez drove Sablan to the hospital where he received medical attention for stab wounds on his left abdomen, his left bicep, and the back of his left shoulder. The wound on his bicep required six stitches; two wounds on his abdomen required six and two stitches, respectively; and the wound on his left shoulder also required about six stitches. All of the wounds left scars that were still visible at the time of the May 2006 trial.

Sablan was in the hospital for about two hours, during which time he and Rodriguez gave statements to officers from the Gilroy Police Department. The officers then took Sablan to the police station and showed him a photographic lineup. He was not able to identify anyone that night as his assailant.

Gilroy Police Officer Michael Bolton met Sablan at the hospital shortly after midnight on May 8, 2005. Medical personnel told Bolton that Sablan's wounds were not life threatening but would require stitches. Sablan, who smelled of alcohol but did not

4

appear intoxicated, told Bolton that he approached a man who was assaulting two women. Sablan asked the women if they needed help, but they did not respond. He wanted to stop the assault, so he verbally confronted the man. The man told Sablan, " 'you fucked with the wrong Norteño.' " The man tried to assault Sablan, but Sablan struck him. The man produced a knife, said, " 'I'm going to fucking kill you,' " and then stabbed Sablan in the left rib area.

When Valdibia first talked to an officer about the incident two or three weeks later, he lied because he was afraid. He said that he did not know whether defendant was at the gas station. He knows that defendant wears red, but he did not know that defendant was a gang member until the officer told him. Valasquez also originally told officers that defendant was not at the gas station. However, when she recognized Valdibia at the police station she said that defendant had been at the gas station. In a jail telephone conversation, defendant threatened Valasquez because she had testified at the preliminary hearing.

## The Gang Evidence

Gilroy Police Officer Gregory Flippo testified as an expert in Hispanic criminal street gangs. There are Norteño and Sureño gangs, and Norteños are the dominant gangs in Gilroy. Norteños identify with the color red, the number 14, and the symbols of the Northern Star and the Welga Bird. The primary activities of the Norteño gangs are murder, assault with a deadly weapon, robbery, carjacking, theft, drug sales, and witness intimidation. A certified record for Paul Zapata, a validated Norteño gang member, showing that he was convicted of murder, was admitted into evidence as exhibit 9. The murder occurred approximately 40 yards away from where the current stabbing incident occurred.

Defendant is a validated Norteño gang member. He has gang tattoos on his hands and right arm. At the time of his arrest on May 14, 2005, defendant was wearing a red belt and a shirt that had a red Welga Bird and "Norteño" printed in bold red letters on it.

5

Defendant told Flippo during an interview that he has been a Norteño gang member all of his life. Flippo also has reviewed approximately 22 police reports and police identification cards going back to 1995 stating that defendant was seen wearing gang clothing and associating with other Norteño gang members. On June 7, 2004, defendant was sentenced to state prison for his conviction by plea to a felony violation of section 245, subdivision (a)(1). At the time of the May 7, 2005, incident, defendant was wearing a red shirt and he told Sablan, " 'you're fucking with the wrong Norteño.' "

Based on all of defendant's history and the current offense, Officer Flippo believed that defendant is a Norteño gang member. Based on defendant's statement to Sablan when defendant stabbed him, Flippo believed that defendant committed the offense to benefit the Norteño criminal street gang, although the incident did not start as a gang-related attack. Defendant's actions benefited the gang and enhanced its reputation. The gang's reputation is based on fear and intimidation, which helps the members in their criminal activities. And, the stabbing incident occurred in a known Norteño gang area. Comments such as the ones defendant made to Sablan are often made to non-gang members. The comments build the individual's status with the gang, build the reputation of the gang, and instill fear in the victims and potential witnesses.

### The Defense Case

Defendant testified in his own defense that he happened to see Valasquez at the gas station and wanted to talk to her. They started arguing and he grabbed her by her wrist. At the time, he had been using methamphetamine and had not slept for three or four days. A man came running at him from behind without saying anything. When defendant turned around, the man hit him, causing him to fall to the ground. When he got up, the man hit him again. Defendant said, "what the fuck, like what's happening." He tried hitting the man, but the man was too fast for him. Defendant fell to the ground again and pulled out the knife he had used to peel wires on the truck stereo system in order to try to scare the man off, but the man kept attacking him. He then ran to the

6

truck, but the man came after him. The man tried to open the truck door after defendant got inside, and he and another person ran after the truck when it took off. Defendant did not know that he had stabbed the man; he did not feel the knife going in the man's body and he did not see any blood. He lost the knife at the gas station and never found it again. He was arrested about one week later.

Defendant said that he grew up with and hangs around gang members but he denied being a Norteño gang member himself. He admitted having pleaded no contest to two 2003 misdemeanor counts of battery on a cohabitant and a felony count of assault with a deadly weapon, and having served a two-year prison term. None of his offenses were gang-related. He was on parole and was wearing a maroon 49ers jersey at the time of the gas station incident.

### *Verdicts and Sentencing*

On June 2, 2006, the trial court found defendant guilty of attempted murder (§§ 664, subd. (a), 187), and found that he personally used a deadly and dangerous weapon, a knife, during the commission of the offense (§ 12022, subd. (b)(1)); that he committed the offense for the benefit of, or in association with, a criminal street gang (§ 186.22, subd. (b)(1)(C)); and that he had served a prior prison term (§ 667.5, subd. (b)). The court found the allegation that defendant inflicted great bodily injury on the victim (§ 12022.7) to be not true. On July 24, 2006, the court sentenced defendant to 15 years in state prison, the sentence consisting of the lower term of five years for the attempted murder with a consecutive term of 10 years for the gang enhancement. The court struck the punishment for the personal-use and prison-prior enhancements pursuant to section 1385.

### DISCUSSION

### *Attempted Murder*

Defendant contends that he has been denied due process as there is insufficient evidence to support the finding of attempted murder. He argues that the prosecution

7

failed to carry its burden of showing that the attempt to kill was not the result of a sudden quarrel or heat of passion.

" 'In reviewing a challenge to the sufficiency of evidence, the reviewing court must determine from the entire record whether a reasonable trier of fact could have found that the prosecution sustained its burden of proof beyond a reasonable doubt. In making this determination, the reviewing court must consider the evidence in a light most favorable to the judgment and presume the existence of every fact the trier could reasonably deduce from the evidence in support of the judgment. The test is whether substantial evidence supports the [conclusion of the trier of fact], not whether the ·evidence proves guilt beyond a reasonable doubt.' [Citations.]" (*People v. Crittenden* (1994) 9 Cal.4th 83, 139; see also *People v. Catlin* (2001) 26 Cal.4th 81, 139 (*Catlin*).) "[W]e do not reweigh the evidence; the credibility of witnesses and the weight to be accorded to the evidence are matters exclusively within the province of the trier of fact. (Evid. Code, § 312.) We simply consider whether ' " '*any* rational trier of fact could have found the essential elements of [defendant's] crime beyond a reasonable doubt.' " [Citations.]' [Citation.]" (*People v. McCleod* (1997) 55 Cal.App.4th 1205, 1221.)

"The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

The elements of attempted murder and attempted voluntary manslaughter due to a sudden quarrel or in the heat of passion are set out in Judicial Council of California Criminal Jury Instructions (2006) CALCRIM Nos. 600 and 603.

8

"To prove that the defendant is guilty of attempted murder, the People must prove that: [¶] 1. The defendant took at least one direct but ineffective step toward killing [a person]; AND [¶] 2. The defendant intended to kill that [person].

"A *direct step* requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to kill. It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt.

"[A person who attempts to commit murder is guilty of attempted murder even if, after taking a direct step toward killing, he or she abandons further efforts to complete the crime, or his or her attempt fails or is interrupted by someone or something beyond his or her control. . . .]" (CALCRIM No. 600.)

"An attempted killing that would otherwise be attempted murder is reduced to attempted voluntary manslaughter if the defendant attempted to kill someone because of a sudden quarrel or in the heat of passion.

"The defendant attempted to kill someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant took at least one direct but ineffective step toward killing a person; [¶] 2. The defendant intended to kill that person; [¶] 3. The defendant attempted the killing because [he or she] was provoked; [¶] 4. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment; AND [¶] 5. The attempted killing was a rash act done under the influence of intense emotion that obscured the defendant's reasoning or judgment.

9

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for heat of passion to reduce an attempted murder to attempted voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as . . . defined . . . . While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up [his or her] own standard of conduct. . . . In deciding whether the provocation was sufficient, consider whether a person of average disposition would have been provoked and how such a person would react in the same situation knowing the same facts.

"[If enough time passed between the provocation and the attempted killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the attempted murder is not reduced to attempt voluntary manslaughter on this basis.]

"The People have the burden of proving beyond a reasonable doubt that the defendant did not attempt to kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, [defendant must be found] not guilty of attempted murder." (CALCRIM No. 603.)

In finding defendant guilty of attempted murder, the trial court stated: "As to the charge in Count 1 the charge is attempted murder. It requires two primary elements. First, that Mr. Casas took at least one direct but ineffective step toward killing another and, two, that he intended to kill that person. In that regard as to the act certainly the stabbing four times of Mr. Sablan would constitute direct though ineffective steps toward killing him. His own word[s ']you're fucking with the wrong Norteno['] and [']I'm

10

going to kill you,['] combined with the reasonable inferences from the physical acts more than support a conclusion that Mr. Casas intended to kill Mr. Sablan. Having determined that I'm satisfied that the – that the prima facie case of attempted murder has been proven, and now the Court must evaluate any defenses or mitigators in determining whether in fact there's anything that reduces the case from attempted murder. The defendant has claimed through his testimony self-defense. . . . Certainly after considering all the evidence I don't have a reasonable doubt that [the] assault by defendant was in self-defense.

"The next issue becomes as to whether there is evidence that would mitigate a finding of malice such that this would constitute an attempted voluntary manslaughter based on a theory of imperfect self-defense as argued by Defense. . . . I'm more than satisfied that it has been proven beyond a reasonable doubt and it's the People's burden to prove beyond a reasonable doubt that this is not attempted voluntary murder – excuse me – manslaughter. I'm satisfied that it was not – that the defendant did not subjectively believe that he was in imminent danger of being killed or suffering great bodily injury. Certainly as the primary aggressor, as the Court has determined, and beginning the chain of events that led to the stabbing of the defendant [*sic*] the Court does not believe that this is a case of imperfect self-defense that would mitigate the finding of malice in this case. Therefore, the Court is satisfied beyond a reasonable doubt that the defendant is guilty of the charge in Count 1, . . . attempted murder."

The court did not expressly find that defendant's attempt to kill was not because of a sudden quarrel or in the heat of passion. However, the court expressly found that defendant did not subjectively believe that he was in imminent danger of being killed or suffering great bodily injury when he attempted to kill Sablan. By doing so, the court implicitly found that defendant was not provoked and/or that any provocation was not sufficient to have caused a person of average disposition to act rashly and without due

11

deliberation at the time defendant stabbed Sablan four times. Substantial evidence supports this implied finding.

The record shows that Sablan approached defendant when he saw defendant grabbing the arm and hair of one woman while another woman tried to get defendant off her. The women appeared to Sablan to be afraid and to want defendant to stop. When Sablan asked the women if they needed help, defendant turned his attention from the women to Sablan, and made a comment regarding his gang affiliation. Although Sablan struck the first blow, he did so in response to defendant's assault on the woman as well as defendant's gang comment and movement toward him. Defendant fell to the ground, and then escalated the situation by telling Sablan that he was going to kill him, pulling out a knife, and stabbing Sablan four times during their mutual combat. This is substantial evidence supporting the court's implied finding that defendant's attempt to kill Sablan by stabbing him four times was not provoked and/or there was not sufficient provocation that would have caused a person of average disposition to act as defendant did. As substantial evidence supports the court's implied finding that defendant committed attempted murder rather than attempted voluntary manslaughter due to a sudden quarrel or in the heat of passion, no due process violation has been shown.

### Ineffective Assistance

Defendant contends that he was denied the effective assistance of counsel due to counsel's failure to argue that his intent to kill was because of a sudden quarrel or in the heat of passion. He argues that there is nothing in the record indicating why counsel failed to raise this potentially meritorious defense, and that there is a reasonable probability that the outcome of his trial would have been different had counsel raised it.

"A defendant seeking relief on the basis of ineffective assistance of counsel must show both that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates, and that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings.

[Citations.]" (*People v. Price* (1991) 1 Cal.4th 324, 440; see also *Strickland v. Washington* (1984) 466 U.S. 668, 687-696 (*Strickland*).) "Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' [Citation.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." (*Strickland, supra*, 466 U.S. at p. 697.)

Although defense counsel did not argue to the court that any finding of intent to kill should be mitigated by a finding of a sudden quarrel or heat of passion, the issue was presented to the court by way of the prosecutor's argument: "I would comment – if the court is entertaining the ideas of possible manslaughter, attempted manslaughter under either a heat of passion or an imperfect self-defense, I would submit to the court that the heat of passion is not within the realm of possible defenses or mitigating defenses because it is unreasonable that – [¶] The reasonable, everyday person is not going to, first of all, beat up his girlfriend in the parking lot of Rotten Robbie on Saturday night; but he's not going to pull out a knife and start stabbing somebody because he gets punched after he's been beating up his girlfriend, which is the standard of a reasonable person. [¶] Reasonable behavior wouldn't cause a person to come – to act as the defendant did, which is to pull a knife and try to stab this person to death." "Heat of passion, which mitigates an attempted manslaughter, that an ordinary person is going to act like the defendant did under same or similar circumstances. And an ordinary person is not going to pull out a knife and try to stab the person, in the totality."

The court stated that it was aware that it was the prosecutor's burden to prove beyond a reasonable doubt that defendant's actions did not constitute attempted voluntary manslaughter rather than attempted murder. The prosecutor argued that the evidence supported a finding that defendant's actions did not constitute attempted voluntary

13

manslaughter under a heat-of-passion theory. Defense counsel argued defendant's claim of self-defense and imperfect self-defense. In light of the prosecutor's argument, and the trial court's express finding that defendant did not subjectively feel that he was in imminent danger of being killed or suffering great bodily injury when he pulled out a knife and stabbed Sablan, it is not reasonably probable that a result more favorable to defendant would have occurred had defense counsel also argued that defendant's stabbing of Sablan was because of a sudden quarrel or in the heat of passion. Defendant has not shown that counsel rendered ineffective assistance.

### Gang Enhancement

Defendant contends that the true finding on the gang enhancement must be reversed as there is insufficient evidence to support it. He argues that there is insufficient evidence that he had the specific intent to benefit the Norteño gang when he committed the attempted murder.

The same standard of review applies to claims of insufficiency of the evidence to support a gang enhancement finding as for a conviction. (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1224; *People v. Ortiz* (1997) 57 Cal.App.4th 480, 484.) "We examine the record to determine 'whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] Further, 'the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]" (*Catlin, supra*, 26 Cal.4th at p. 139.) " 'A reasonable inference, however, "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." ' [Citation.]" (*People v. Raley* (1992) 2 Cal.4th 870, 891.)

"This standard applies whether direct or circumstantial evidence is involved." (*Catlin, supra*, 26 Cal.4th at p. 139.) The element of intent is generally proved with

14

circumstantial evidence. "Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense. [Citations.]" (*People v. Pre* (2004) 117 Cal.App.4th 413, 420.) Evidence to support the element of specific intent may be shown by a defendant's conduct, including any words the defendant may have spoken, and by all the circumstances surrounding the commission of the acts. (*People v. Craig* (1994) 25 Cal.App.4th 1593, 1597; *People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690-691.)

Section 186.22, subdivision (b)(1)(C) imposes additional punishment of 10 years when a defendant is convicted of a violent felony as defined in section 667.5, subdivision (c), "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) Attempted murder is listed as one such violent felony. (§ 667.5, subd. (c)(12).) The essential elements of an allegation under section 186.22, subdivision (b)(1), are: (1) the crime charged, in this case attempted murder, was committed for the benefit of, at the direction of, or in association with a criminal street gang; and (2) the crime was committed with the specific intent to promote, further, or assist in any criminal conduct by gang members. (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 (*Morales*).) Defendant contends that the prosecution failed to establish the latter element of the enhancement.

The record discloses that Sablan saw defendant grab Valasquez's arm and hair while another woman tried to get defendant to stop. Both women appeared to Sablan to be afraid, so Sablan approached them and asked if they needed help. Defendant turned his attention from the women to Sablan. During the ensuing mutual combat, defendant said, "I'm going to kill you," pulled out a knife, and stabbed Sablan four times. We have already determined that this is sufficient evidence to support the court's finding that defendant committed attempted murder.

15

The record further discloses that Valasquez testified that she knew that defendant was a Norteño gang member and that he liked to wear red clothing. Detective Flippo testified that Norteño gang members identify with the color red, that the charged offense occurred in a known Norteño gang area, that defendant was wearing a red T-shirt at the time of the charged offense, and that defendant admitted to the detective that he has been a Norteño gang member all his life. When Sablan approached and asked Valasquez and her friend if they needed help, defendant stated, "You're fucking with the wrong Norteño." Sablan understood that defendant was using a gang term and thought defendant was going to hit him, so he struck first. Defendant said, "I'm going to kill you," pulled out a knife, and stabbed Sablan four times during the ensuing mutual combat. Detective Flippo testified that defendant's actions benefited the gang and enhanced its reputation. The gang's reputation is based on fear and intimidation, which helps the members in their criminal activities. Detective Flippo also testified that comments such that the ones defendant made to Sablan are often made to non-gang members; the comments build the individual's status with the gang, build the reputation of the gang, and instill fear in the victims and potential witnesses.

We conclude that this is sufficient evidence to support the section 186.22, subdivision (b)(1)(C) element that the attempted murder was committed "with the specific intent to promote, further, or assist in any criminal conduct by gang members." In our limited role of evaluating a sufficiency-of-the-evidence claim, we do not reweigh the evidence, redetermine issues of credibility, or second-guess whether we would have reached a conclusion different from the trier of fact. (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 931; see also *In re Ramon T.* (1997) 57 Cal.App.4th 201, 207-208.) Thus, as another appellate court reasoned in rejecting a similar challenge to a gang enhancement finding: "Here a qualified expert testified the participation of a Southside gang member in a Townsend Street retaliation killing would benefit Southside by enhancing its 'respect.' It was for the [trier of fact] to assess the weight of that testimony

16

in the first instance, and since we believe a 'rational [trier of fact]' could have been convinced by it, we cannot deem it insufficient." (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1384.)

"There is no requirement in section 186.22, subdivision (b), that the defendant's intent to enable or promote criminal endeavors by gang members must relate to criminal activity apart from the offense the defendant commits. To the contrary, the specific intent required by the statute is 'to promote, further, or assist in *any* criminal conduct by gang members.' (Pen. Code, § 186. 22, subd. (b), italics added.) Therefore, defendant's own [conduct] qualified as the gang-related criminal activity. No further evidence on this element was necessary." (*People v. Hill* (2006) 142 Cal.App.4th 770, 774.) We find substantial evidence supports the court's finding that defendant committed the attempted murder for the benefit of, or in association with, a criminal street gang.

## DISPOSITION

The judgment is affirmed.

17

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____
MCADAMS, J.

_____
DUFFY, J.

*People v. Casas*
H030514

18





Court of Appeal, Sixth Appellate District - No. H030514
**S156203**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

THE PEOPLE, Plaintiff and Respondent,

v.

RAFAEL ESPINOZA CASA, Defendant and Appellant.

The petition for review is denied.

· SUPREME COURT
**FILED**

NOV **1 4** 2007

Frederick K. Ohlrich Clerk

Deputy

Chief Justice

STATE OF CALIFORNIA COUNTY OF MONTEREY

I, Rafael E. Casas declare under penalty of perjury that: I am the Petitioner in the above entitled action; I have read the foregoing documents and know the contents thereof and the same is true of my own knowledge, except as to matters stated therein upon information, and belief, and as to those matters, I believe they are true.

Executed this 8 day of July, 20 08, at Salinas Valley State Prison, Soledad, CA 93960-1050.

(Signature) Rafael Casas
DECLARANT/PRISONER

## PROOF OF SERVICE BY MAIL

I, Rafael E. Casas, am a resident of California State Prison, in the County of Monterey, State of California; I am over the age of eighteen (18) years and am/am not a party of the above entitled action. My state prison address is: P.O. Box 1050, Soledad, CA 93960-1050.

On July 8, 20 08, I served the foregoing: Habeas Corpus with two (2) exhibits.

(Set forth exact title of document(s) served)

On the party(s) herein by placing a true copy(s) thereof, enclosed in sealed envelope(s), with postage thereof fully paid, in the United States Mail, in a deposit box so provided at Salinas Valley State Prison, Soledad, CA 93960-1050.

United States District Court Northern District of California
Three copies, one original, and Two copies

(List parties served)

There is delivery service by United States Mail at the place so addressed, and/or there is regular communication by mail between the place of mailing and the place so addressed.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: 7-8-, 20 08

x Rafael Casas
DECLARANT/PRISONER