United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RAFAEL E. CASAS,

Plaintiff,

v.

ANTHONY HEDGPETH,[1]

Respondent.

NO. C08-3900 TEH

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Pro se Petitioner Rafael E. Casas is currently incarcerated by the California Department of Corrections and Rehabilitation at Salinas Valley State Prison in Soledad, California. He filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, on August 14, 2008, and requested an evidentiary hearing on his claims. On April 1, 2009, this Court ordered Respondent to show cause as to why Petitioner's amended petition should not be granted. Respondent filed an answer on July 1, 2009. Petitioner did not file a traverse. After carefully reviewing the parties' written arguments, the record, and governing law, the Court now DENIES the petition for the reasons set forth below.

## I. BACKGROUND

This case stems from Petitioner's conviction of attempted second degree murder. The California Court of Appeal summarized the evidence presented at trial as follows:

> ***The Prosecution's Case*** [FN2]
>
> [FN2] As the prosecutor dismissed count 2 [possession of methamphetamine], we do not set forth the evidence presented in support of that count.

---

[1] Anthony Hedgpeth, warden at Salinas Valley State Prison, where Petitioner is currently confined, is hereby substituted as Respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

United States District Court
For the Northern District of California

**The Events of May 7, 2005**

On May 7, 2005, defendant went to San Jose to install a stereo system in a black truck owned by Francisco Valdibia. When he was done, Valdibia drove defendant back to Gilroy. They stopped at a Rotten Robbie gas station there, where defendant saw his girlfriend Bianca Valasquez. Defendant went to talk to Valasquez while Valdibia put gas in his truck. Defendant appeared to Valdibia to be upset at Valasquez and was yelling at her. As Valdibia was leaving, he saw defendant being chased by two people. Valdibia stopped and defendant jumped in the truck. He yelled at Valasquez to get into the truck with him. Valdibia asked defendant what was happening. Defendant said that he was just fighting with his girlfriend, and he told Valdibia to just drive him home. Valdibia did so and then went home himself. He did not see defendant with a knife.

Valasquez [FN3] first met defendant in 2003. Defendant liked to wear red, and Valasquez knew that he was a Norteño gang member. By May 7, 2005, defendant and Valasquez had been living together for about five months. Around 11:30 p.m. that night, Valasquez was at the gas station with her friend Angelica in order to use the restroom. She saw defendant drive up in a black truck with somebody she did not recognize. Defendant saw Valasquez and asked her what she was doing there. He demanded that she go home with him and she refused. Defendant grabbed her by the arm and hair and yelled at her. Angelica yelled at defendant to let Valasquez go. Valasquez saw a man get out of a car, approach them, and ask her if she was all right. The man then hit defendant, causing him to fall to the ground. When defendant got up, Valasquez saw that he had a knife. The two men started fighting, but Valasquez did not see defendant stab the man. Defendant ran from the man back to the black truck, and the man and two women followed him. Defendant left in the truck before the others reached him. Defendant later told Valasquez that he hid the knife and told her to not say anything if asked about the incident.

> [FN3] Valasquez testified that she was convicted of two counts of felony burglary in 1998.

Close to midnight on May 7, 2005, John Sablan, [FN4] his cousin Kristalyn Rodriguez, and her friend Erika were parked near the restrooms at the gas station. Rodriguez and Erika were in the front seat of Rodriquez's [sic] car, and Sablan was asleep in the back seat. They had all been drinking and Sablan was tired. Rodriguez woke Sablan up and asked him to help some woman. Sablan saw defendant, who was about 20 feet away and who was wearing a red T-shirt and black jeans, pull one woman's hair while another woman tried to grab him off her. Sablan approached defendant and the two women. The two women were yelling at defendant in Spanish; they appeared to Sablan to be afraid and to want defendant to stop.

United States District Court
For the Northern District of California

> [FN4] Sablan testified that he was convicted in 2003 of battery on a peace officer (§ 243, subd. (b)), and possession of a firearm (§ 12021, subd. (c)).

Sablan asked the women if they were all right or if they needed help. Defendant told Sablan to mind his own business and said, "You're fucking with the wrong Norteño." Defendant then ran at Sablan with his hands in a fist. Sablan understood that defendant was using a gang term and thought that defendant was going to hit him; he did not see a knife. He stood his ground and hit defendant in the face with his fist. Defendant fell to the ground, but got back up and said, "I'm going to kill you." Defendant and Sablan then began fighting.

After a few minutes, a black truck pulled up and defendant ran to it and got in the passenger side. Sablan and Rodriquez [sic] chased defendant, but the truck drove off. Rodriguez asked Sablan if he had been hurt. Sablan lifted up his shirt and they saw a lot of blood. Rodriguez drove Sablan to the hospital where he received medical attention for stab wounds on his left abdomen, his left bicep, and the back of his left shoulder. The wound on his bicep required six stitches; two wounds on his abdomen required six and two stitches, respectively; and the wound on his left shoulder also required about six stitches. All of the wounds left scars that were still visible at the time of the May 2006 trial.

Sablan was in the hospital for about two hours, during which time he and Rodriguez gave statements to officers from the Gilroy Police Department. The officers then took Sablan to the police station and showed him a photographic lineup. He was not able to identify anyone that night as his assailant.

Gilroy Police Officer Michael Bolton met Sablan at the hospital shortly after midnight on May 8, 2005. Medical personnel told Bolton that Sablan's wounds were not life threatening but would require stitches. Sablan, who smelled of alcohol but did not appear intoxicated, told Bolton that he approached a man who was assaulting two women. Sablan asked the women if they needed help, but they did not respond. He wanted to stop the assault, so he verbally confronted the man. The man told Sablan, "'you fucked with the wrong Norteño.'" The man tried to assault Sablan, but Sablan struck him. The man produced a knife, said, "'I'm going to fucking kill you,'" and then stabbed Sablan in the left rib area.

When Valdibia first talked to an officer about the incident two or three weeks later, he lied because he was afraid. He said that he did not know whether defendant was at the gas station. He knows that defendant wears red, but he did not know that defendant was a gang member until the officer told him. Valasquez also originally told officers that defendant was not at the gas station. However, when she recognized Valdibia at the police station she said that defendant had been at the gas station.

In a jail telephone conversation, defendant threatened Valasquez because she had testified at the preliminary hearing.

**The Gang Evidence**

Gilroy Police Officer Gregory Flippo testified as an expert in Hispanic criminal street gangs. There are Norteño and Sureño gangs, and Norteños are the dominant gangs in Gilroy. Norteños identify with the color red, the number 14, and the symbols of the Northern Star and the Welga Bird. The primary activities of the Norteño gangs are murder, assault with a deadly weapon, robbery, carjacking, theft, drug sales, and witness intimidation. A certified record for Paul Zapata, a validated Norteño gang member, showing that he was convicted of murder, was admitted into evidence as exhibit 9. The murder occurred approximately 40 yards away from where the current stabbing incident occurred.

Defendant is a validated Norteño gang member. He has gang tattoos on his hands and right arm. At the time of his arrest on May 14, 2005, defendant was wearing a red belt and a shirt that had a red Welga Bird and "Norteño" printed in bold red letters on it. Defendant told Flippo during an interview that he has been a Norteño gang member all of his life. Flippo also has reviewed approximately 22 police reports and police identification cards going back to 1995 stating that defendant was seen wearing gang clothing and associating with other Norteño gang members. On June 7, 2004, defendant was sentenced to state prison for his conviction by plea to a felony violation of section 245, subdivision (a)(1). At the time of the May 7, 2005, incident, defendant was wearing a red shirt and he told Sablan, "'you're fucking with the wrong Norteño.'"

Based on all of defendant's history and the current offense, Officer Flippo believed that defendant is a Norteño gang member. Based on defendant's statement to Sablan when defendant stabbed him, Flippo believed that defendant committed the offense to benefit the Norteño criminal street gang, although the incident did not start as a gang-related attack. Defendant's actions benefited the gang and enhanced its reputation. The gang's reputation is based on fear and intimidation, which helps the members in their criminal activities. And, the stabbing incident occurred in a known Norteño gang area. Comments such as the ones defendant made to Sablan are often made to non-gang members. The comments build the individual's status with the gang, build the reputation of the gang, and instill fear in the victims and potential witnesses.

***The Defense Case***

Defendant testified in his own defense that he happened to see Valasquez at the gas station and wanted to talk to her. They started arguing and he grabbed her by her wrist. At the time, he had been using methamphetamine and had not slept for three or four days. A man came running at him from behind without

> saying anything. When defendant turned around, the man hit him, causing him to fall to the ground. When he got up, the man hit him again. Defendant said, "what the fuck, like what's happening." He tried hitting the man, but the man was too fast for him. Defendant fell to the ground again and pulled out the knife he had used to peel wires on the truck stereo system in order to try to scare the man off, but the man kept attacking him. He then ran to the truck, but the man came after him. The man tried to open the truck door after defendant got inside, and he and another person ran after the truck when it took off. Defendant did not know that he had stabbed the man; he did not feel the knife going in the man's body and he did not see any blood. He lost the knife at the gas station and never found it again. He was arrested about one week later.
>
> Defendant said that he grew up with and hangs around gang members but he denied being a Norteño gang member himself. He admitted having pleaded no contest to two 2003 misdemeanor counts of battery on a cohabitant and a felony count of assault with a deadly weapon, and having served a two-year prison term. None of his offenses were gang-related. He was on parole and was wearing a maroon 49ers jersey at the time of the gas station incident.

Resp. Ex. 6 at 2-7 (*People v. Casas*, Cal. Ct. App. decision, Case No. H030514 (Aug. 2, 2007)).

Petitioner waived a jury trial and, on June 2, 2006, the trial court in the California Superior Court for Santa Clara County found Petitioner guilty of attempted second degree murder, in violation of California Penal Code sections 187 and 664(a). The court also found that Petitioner personally used a deadly or dangerous weapon in the commission of the offense, in violation of California Penal Code section 12022(b)(1); that he committed the offense for the benefit of, or in association with, a criminal street gang, in violation of California Penal Code section 186.22(b)(1)(C); and that he had served a prior prison term, such that California Penal Code section 667.5(b) applied. On July 24, 2006, the court sentenced Petitioner to fifteen years in state prison, consisting of five years for attempted murder with a consecutive term of ten years for the gang enhancement. The court did not impose any additional punishment for the weapon enhancement or prior prison term.

On August 2, 2007, the California Court of Appeal affirmed Petitioner's conviction. The California Supreme Court summarily denied review on November 14, 2007.

On August 14, 2008, Petitioner filed a petition for writ of habeas corpus in this Court, which has subject matter jurisdiction under 28 U.S.C. § 2254. Venue is proper in this district under 28 U.S.C. § 2241(d), and the parties do not dispute that Petitioner has exhausted his state remedies as to all of the claims presented in the petition. The parties also do not dispute that the petition is timely.

## II. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court cannot grant a writ of habeas corpus with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by [the] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A decision is an "unreasonable application" of clearly established law if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

Holdings of the Supreme Court at the time of the state court decision are the only definitive source of clearly established federal law under AEDPA. *Id.* at 412. "While circuit law may be persuasive authority for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied." *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003) (internal quotation marks and citation omitted).

United States District Court
For the Northern District of California

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citation omitted). Moreover, in conducting its analysis, the federal court must presume the correctness of the state court's factual findings, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C § 2254(e)(1).

When applying these standards, the federal court should review the "last reasoned decision" by the state courts. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002). Because the California Supreme Court summarily denied relief, this Court looks to the California Court of Appeal's August 2, 2007 written decision denying Petitioner's appeal.

## III. DISCUSSION

### A. Sufficiency of the Evidence

Petitioner's first and third claims for relief raise due process challenges based on sufficiency of the evidence. His first claim asserts that the evidence at trial was insufficient to support an attempted murder conviction because the prosecution failed to show that he did not act in the heat of passion or as the result of a sudden quarrel. His third claim contends that the evidence was insufficient to support imposition of a gang enhancement.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A federal court collaterally reviewing a state court conviction does not determine if the evidence at trial established guilt beyond a reasonable doubt; instead, the court's role is to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (emphasis in original). Thus, a petitioner's writ may be granted only if "no rational trier of fact could have found proof of guilt beyond a reasonable doubt."

United States District Court
For the Northern District of California

*Id.* at 324. The reviewing court must also presume that the trier of fact resolved any conflicting inferences "in favor of the prosecution, and must defer to that resolution." *Id.* at 326. Pursuant to AEDPA, the court's inquiry is limited to whether the state court's decision was "an unreasonable application of *Jackson* and *Winship*" to the facts of the case. *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005) (internal quotation marks omitted).

The appellate court applied the correct legal standard to both Petitioner's first and third claims, Resp. Ex. 6 at 4-5, 8-9, and Petitioner does not contend otherwise.

**1. Attempted Murder**

Neither Petitioner nor Respondent have pointed to anywhere in the record where Petitioner's trial counsel raised a heat of passion or sudden quarrel theory. Instead, counsel appears to have focused on imperfect self-defense. *See, e.g.*, Resp. Ex. 9 at 323:16-325:26 (Rep. Tr.) (defense counsel's closing argument). However, the prosecutor specifically raised heat of passion during his closing argument:

> I would comment on – if the court is entertaining the ideas of possible manslaughter, attempted manslaughter under either a heat of passion or an imperfect self-defense, I would submit to the court that the heat of passion is not within the realm of possible defenses or mitigating defenses because it is unreasonable that –
>
> The reasonable, everyday person is not going to, first of all, beat up his girlfriend in the parking lot of Rotten Robbie on Saturday night; but he's not going to pull out a knife and start stabbing somebody because he gets punched after he's beating up his girlfriend, which is the standard of a reasonable person.
>
> Reasonable behavior wouldn't cause a person to come – to act as the defendant did, which is to pull a knife and try to stab this person to death. . . .
>
> Heat of passion, which mitigates an attempted manslaughter, that an ordinary person is going to act like the defendant did under same or similar circumstances. And an ordinary person is not going to pull out a knife and try to stab the person, in the totality.

*Id.* at 332:19-333:18.

The trial judge addressed imperfect self-defense but did not address heat of passion:

> The next issue becomes as to whether there is evidence that would mitigate a finding of malice such that this would constitute

United States District Court
For the Northern District of California

> an attempted voluntary manslaughter based on a theory of imperfect self defense as argued by Defense. That requires in essence the basic elements of attempted murder but with additional elements. One, that – first of all, that he took at least one direct but ineffective step toward killing another. Two, that he intended to kill when he acted. Third, that he believed he was in imminent danger of being killed or suffering great bodily injury. Four, believed that the immediate use of deadly force was necessary to defend against the danger but that his belief was objectively unreasonable. The Court is more than satisfied, first of all working backwards, that any such belief was objectively unreasonable under the facts, however, I'm more than satisfied that it has been proven beyond a reasonable doubt and it's the People's burden to prove beyond a reasonable doubt that this is not attempted voluntary murder – excuse me – manslaughter. I'm satisfied that it was not – that the defendant did not subjectively believe that he was in imminent danger of being killed or suffering great bodily injury. Certainly as the primary aggressor, as the Court has determined, and beginning the chain of events that led to the stabbing of the defendant the Court does not believe that this is a case of imperfect self defense that would mitigate the finding of malice in this case. Therefore, the Court is satisfied beyond a reasonable doubt that the defendant is guilty of the charge in Count 1, a violation of Penal Code Section 664(a)/187, attempted murder.

*Id.* at 407:20-408:22.

On review, the appellate court concluded:

> The [trial] court did not expressly find that defendant's attempt to kill was not because of a sudden quarrel or in the heat of passion. However, the court expressly found that defendant did not subjectively believe that he was in imminent danger of being killed or suffering great bodily injury when he attempted to kill Sablan. By doing so, the court implicitly found that defendant was not provoked and/or that any provocation was not sufficient to have caused a person of average disposition to act rashly and without due deliberation at the time defendant stabbed Sablan four times.[2] Substantial evidence supports this implied finding.
>
> The record shows that Sablan approached defendant when he saw defendant grabbing the arm and hair of one woman while another woman tried to get defendant off her. The women appeared to Sablan to be afraid and to want defendant to stop. When Sablan asked the women if they needed help, defendant turned his attention from the women to Sablan, and made a comment

[2]Petitioner does not contest that reducing attempted murder to attempted voluntary manslaughter based on a heat of passion or sudden quarrel theory requires provocation "sufficient to cause an ordinary person of average disposition to act rashly and without due deliberation and reflection, and from this passion rather than judgment." Attach. to Pet. at 2 (quotation marks and citation omitted); *see also* Resp. Ex. 6 at 5-6 (including this factor in the appellate court's recitation of the Judicial Council of California Criminal Jury Instructions).

     United States District Court
For the Northern District of California

> regarding his gang affiliation. Although Sablan struck the first blow, he did so in response to defendant's assault on the woman as well as defendant's gang comment and movement toward him. Defendant fell to the ground, and then escalated the situation by telling Sablan that he was going to kill him, pulling out a knife, and stabbing Sablan four times during their mutual combat. This is substantial evidence supporting the court's implied finding that defendant's attempt to kill Sablan by stabbing him four times was not provoked and/or there was not sufficient provocation that would have caused a person of average disposition to act as defendant did. As substantial evidence supports the court's implied finding that defendant committed attempted murder rather than attempted voluntary manslaughter due to a sudden quarrel or in the heat of passion, no due process violation has been shown.

Resp. Ex. 6 at 11-12 (footnote added).

This Court cannot say, after reviewing the record, that no rational trier of fact could find that Petitioner was guilty of attempted murder beyond a reasonable doubt, even after considering a heat of passion or sudden quarrel theory. Thus, the appellate court's determination was not an unreasonable application of clearly established federal law, and relief on this claim is DENIED.

**2. Gang Enhancement**

Petitioner also contends that there was insufficient evidence to impose a gang enhancement. California Penal Code section 186.22(b) provides for an enhanced sentence if a felony is "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." Petitioner argues that the evidence failed to establish that he acted with "specific intent to benefit his gang." Attach. to Pet. at 11.

The trial court admitted that it "struggled" with imposing the enhancement before explaining its reasons for doing so:

> Next is the gang enhancement pursuant to Penal Code Section 186.22(b)(1)(c) [sic]. And I will tell counsel for both sides and Mr. Casas that I have struggled with this enhancement. The finding is going to go adverse to Mr. Casas for reasons I'm going to state. But I understand your argument and I understand how reasonable minds can differ and I am not satisfied that every offense committed by a validated gang member falls within the gang enhancement. . . . [T]he issue that the Court . . . has struggled with is whether the conduct was for the benefit of a

United States District Court
For the Northern District of California

> criminal street gang. And I've listened carefully to the testimony of Detective Flippo, and I'm satisfied that an argument can be made that pretty much any criminal offense committed by a gang member can be argued to be for the benefit of a gang. But I have to look at the facts and circumstances of this case. And I'll contrast this case with a different factual scenario. If Mr. Casas had been driving down the road with the two ladies, and Mr. Sablan was driving down the road or was a passenger in the vehicle with the two ladies in that vehicle, and they have a fender bender or some kind of interaction and the vehicles pull over and Mr. Sablan and Mr. Casas get out and get into a big argument and it results in Mr. Casas stabbing Mr. Sablan four times on that set of facts, I would be hard pressed to find that that assault was for the benefit of a gang. Certainly I would hear testimony or could hear testimony that from a gang expert that would say, well, any time a member of the gang is involved in that type of assault that the reputation of the gang, the reputation of the party is all benefited by him committing that assault. That if he were to withdraw from the scene that that would be showing weakness that would negatively effect the gang, et cetera, et cetera, et cetera, but in the Court's view that case would be nothing about being a gang case. I have to contrast that and see are there issues or facts here that are different, because there is no testimony that Mr. Sablan is a gangster. There is no testimony that he initiated any gang discussion. There's no evidence that this was a turf dispute or any other quote gang dispute. However, we have Mr. Casas who is out in public and very clear quote representing himself as it were as a [Norteño] from his red belt to his T-shirt with [Norteño] on it, with – although I'm not really relying on that because it's not really clear to me but to the extent there are outwardly recognizable tattoos – and I'm not talking about what would be on his fingers because I'm not sure that would be seen – I had to struggle to see it when he was on the witness stand. But when he is representing himself as a [Norteño] and he makes the statement you fucked with the wrong [Norteño], in his mind and to the Court's satisfaction he is escalating this to a gang event. And as such I'm hard pressed to not find true that it was for the benefit of a gang. Therefore, I'm satisfied beyond a reasonable doubt to find the allegation, the gang allegation pursuant to Penal Code Section 186.22(b)(1)(c) [sic] to be true.

Resp. Ex. 9 at 410:5-412:11.

The appellate court concluded that the evidence at trial was sufficient to support a gang enhancement:

> The record further discloses that Valasquez testified that she knew that defendant was a Norteño gang member and that he liked to wear red clothing. Detective Flippo testified that Norteño gang members identify with the color red, that the charged offense occurred in a known Norteño gang area, that defendant was wearing a red T-shirt at the time of the charged

> offense, and that defendant admitted to the detective that he has been a Norteño gang member all his life. When Sablan approached and asked Valasquez and her friend if they needed help, defendant stated, "You're fucking with the wrong Norteño." Sablan understood that defendant was using a gang term and thought defendant was going to hit him, so he struck first. Defendant said, "I'm going to kill you," pulled out a knife, and stabbed Sablan four times during the ensuing mutual combat. Detective Flippo testified that defendant's actions benefited the gang and enhanced its reputation. The gang's reputation is based on fear and intimidation, which helps the members in their criminal activities. Detective Flippo also testified that comments such [as] the ones defendant made to Sablan are often made to non-gang members; the comments build the individual's status with the gang, build the reputation of the gang, and instill fear in the victims and potential witnesses.
>
> We conclude that this is sufficient evidence to support the section 186.22, subdivision (b)(1)(C) element that the attempted murder was committed "with the specific intent to promote, further, or assist in any criminal conduct by gang members." In our limited role of evaluating a sufficiency-of-the-evidence claim, we do not reweigh the evidence, redetermine issues of credibility, or second-guess whether we would have reached a conclusion different from the trier of fact. (*People v. Ferraez* (2003) 112 Cal. App.4th 925, 931; see also *In re Ramon T.* (1997) 57 Cal. App. 4th 201, 207-208.) Thus, as another appellate court reasoned in rejecting a similar challenge to a gang enhancement finding: "Here a qualified expert testified the participation of a Southside gang member in a Townsend Street retaliation killing would benefit Southside by enhancing its 'respect.' It was for the [trier of fact] to assess the weight of that testimony in the first instance, and since we believe a 'rational [trier of fact]' could have been convinced by it, we cannot deem it insufficient." (*People v. Olguin* (1994) 31 Cal. App. 4th 1355, 1384.)

Resp. Ex. 6 at 16-17.

This Court agrees with the appellate court's determination. The trial court admitted that it struggled with whether to impose the enhancement, and it may well be that a different trier of fact might have found in Petitioner's favor. However, this Court's review is limited to the more narrow question of whether it was unreasonable for the appellate court to have found that *any* rational trier of fact could have found the necessary elements to support a gang enhancement. Because the Court answers this question in the negative, relief on this claim must be DENIED.

**B. Ineffective Assistance of Counsel**

Petitioner's remaining claim seeks habeas relief based on alleged ineffective assistance of counsel. The standard for such a claim has been well-established since *Strickland v. Washington*, 466 U.S. 668 (1984), and was correctly described by the state court, Resp. Ex. 6 at 12-13. To prevail on such a claim, a petitioner must show both "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Id.* at 687. The first component requires showing "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The second component requires showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. A court need not "address both components of the inquiry if the [petitioner] makes an insufficient showing on one." *Id.* at 697.

Petitioner in this case asserts that his trial counsel was ineffective because he failed to argue that Petitioner acted in the heat of passion or as the result of a sudden quarrel, which would have reduced the offense from attempted murder to attempted voluntary manslaughter. The appellate court relied on the prejudice prong of *Strickland* in rejecting Petitioner's claim:

> The [trial] court stated that it was aware that it was the prosecutor's burden to prove beyond a reasonable doubt that defendant's actions did not constitute attempted voluntary manslaughter rather than attempted murder. The prosecutor argued that the evidence supported a finding that defendant's actions did not constitute attempted voluntary manslaughter under a heat-of-passion theory. Defense counsel argued defendant's claim of self-defense and imperfect self-defense. In light of the prosecutor's argument, and the trial court's express finding that defendant did not subjectively feel that he was in imminent danger of being killed or suffering great bodily injury when he pulled out a knife and stabbed Sablan, it is not reasonably probable that a result more favorable to defendant would have occurred had defense counsel also argued that defendant's stabbing of Sablan was because of a sudden quarrel or in the heat of passion. Defendant has not shown that counsel rendered ineffective assistance.

Resp. Ex. 6 at 13-14.

United States District Court
For the Northern District of California

The appellate court's conclusion was not an unreasonable application of *Strickland*, and this Court agrees that Petitioner has failed to establish a reasonable probability of a different result had his counsel argued a heat of passion or sudden quarrel theory. Petitioner's ineffective assistance of counsel claim is therefore DENIED.

## IV. CONCLUSION

For all of the above reasons, Petitioner has failed to show that he is entitled to habeas relief in this case. Accordingly, with good cause appearing, the petition for a writ of habeas corpus is DENIED. Because a hearing is unnecessary to resolve Petitioner's claims, Petitioner's request for an evidentiary hearing is also DENIED. The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated: 07/25/11

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT